1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALEJANDRO BALTODANO,

　　　　　　　Petitioner,

　　v.

PAMELA BONDI *et al.*,

　　　　　　　Respondents.

Case No. C25-1958RSL

ORDER GRANTING
HABEAS PETITION

This matter comes before the Court on petitioner's petition for writ of habeas corpus (Dkt. # 7), the Government's response[1] (Dkt. # 23); and petitioner's reply (Dkt. # 26). Having reviewed these filings[2] and the record herein, the Court GRANTS petitioner's petition.

**I.    Background**

Petitioner Alejandro Francisco Baltodano is a native and citizen of Nicaragua. Dkt. # 7, Ex. 1 at 1. He is 47 years old. Dkt. # 20. Petitioner was originally ordered deported on

---

[1] The Court notes that the Government has previously stated that "Respondent Bruce Scott is not a Federal Respondent and is not represented by the U.S. Attorney's office." Dkt. # 16 at 4, n.1. To date, respondent Bruce Scott has not appeared in this matter. The Court directs both parties to make every effort to ensure that respondent Bruce Scott, identified by petitioner as "Warden of Immigration Detention Facility," is notified of this order immediately.

[2] This matter can be decided on the papers submitted. Petitioner's request for oral argument is DENIED.

ORDER GRANTING HABEAS PETITION - 1

November 14, 2018. Dkt. # 7, Ex. 1 at 1. After a determination by a United States Immigration Judge ("IJ") that petitioner had committed a particularly serious crime and was therefore ineligible for most forms of relief from deportation, petitioner was deported on February 6, 2019. Dkt. # 13 at ¶ 4.

The Government states that petitioner has an "extensive and dangerous criminal history," with twenty-four convictions between Sept. 2010 and June 2016 for crimes including robbery, assault, burglary, cruelty toward a child, and domestic violence. Dkt. # 23 at 5. Petitioner states that he has "chronic mental health disorders including diagnoses of bipolar disorder, schizophrenia, persistent depressive disorder, and posttraumatic stress disorder." Dkt. # 7 at 5:23–25. Petitioner also states that his "serious mental illness" is "currently controlled by medication." Dkt. # 18 at 2:15. In addition, petitioner states that "a detailed release plan including release to Mr. Baltodano's sister, a United States citizen who lives in Downey, CA, was proposed during Mr. Baltodano's immigration proceedings . . . and could be followed closely today" if this petition were to be granted. Dkt. # 15 at 16:2–5. *See also* Dkt. # 15, Ex. 3 at 7 and Ex. 4A–G.

The Government believes that petitioner reentered the United States "without inspection or parole . . . on or about January 7, 2024." Dkt. # 13 at ¶ 5. He was "encountered by a U.S. Border Patrol agent on or about January 8, 2024 and processed for reinstatement of the prior removal order." *Id*. at ¶ 6. On March 5, 2025, an IJ granted petitioner deferral of removal under the Convention Against Torture ("CAT"), finding that petitioner, who in the past engaged in political activism against the government of President Daniel Ortega of Nicaragua, "has

established that he experienced past torture at the hands of the Nicaraguan government and that he faces a more than fifty percent likelihood of experiencing torture at the hands of the Nicaraguan government or with its acquiescence upon return." Dkt. # 7 at 5:19 and Ex. 1 at 12. Petitioner states that he has been in the custody of Immigration and Customs Enforcement ("ICE") for more than 20 months and is currently detained at the Northwest ICE Processing Center. Dkt. # 7 at 2–3. He is seeking a writ of habeas corpus under 28 U.S.C. § 2241, arguing that his detention for more than six months "violates the Fifth Amendment's Due Process Clause and 8 U.S.C. § 1231 as interpreted by *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)." Dkt. # 9 at 1.

Petitioner's efforts to obtain a writ of habeas corpus under 28 U.S.C. § 2241 began on Oct. 9, 2025. Dkt. # 1. In a signed declaration, petitioner's immigration attorney stated that on Oct. 17, 2025, she was called by an officer at the Northwest Immigration Processing Center and told that ICE was seeking to deport petitioner to a third country. Dkt. # 9, Ex. 1. On Oct. 20, 2025, petitioner filed a motion for temporary restraining order ("TRO") asking this Court to, among other things, prevent petitioner's removal to a third country. Dkt. # 9. On October 22, 2025, the Government filed a response and a declaration from Daniel Strzelczyk, a deportation officer employed by the United States Department of Homeland Security. Dkts. # 12, 13. The Government's response confirmed that "ICE intends to remove [petitioner] to a third country." Dkt. # 12 at 11:19–23. It also stated that on October 21, 2025, petitioner was served written notice of ICE's intent to remove him to Honduras. *Id*. On Oct. 23, 2025, this Court granted in part and denied in part petitioner's motion for TRO. Dkt. # 14.

ORDER GRANTING HABEAS PETITION - 3

Petitioner then moved for a preliminary injunction. Dkt. # 15. In its response, the Government again stated that it intends to remove petitioner to a third country. Dkt. # 16 at 7:10. The Government maintained that petitioner had been served written notice of the Government's intent to remove him to Honduras and, in addition, stated that it "anticipate[d] also serving [petitioner] written notice of intent to remove him to Mexico." Dkt. # 16 at 7:11–14. The Court held a hearing on petitioner's motion for preliminary injunction on Nov. 6, 2025. Dkt. # 19. In supplemental briefing submitted after that hearing, the Government submitted evidence showing that it has informed petitioner of the Government's intent to remove him to Mexico or Honduras. Dkt. # 21, Ex. A. On Nov. 7, 2025, the Court granted in part petitioner's motion for preliminary injunction, ordering that petitioner not be removed "to a third country without notice and a meaningful opportunity to respond in compliance with statute and due process in reopened removal proceedings." Dkt. # 22.

Briefing on petitioner's habeas petition concluded on Nov. 21, 2025. Dkt. # 26.

## II.    Discussion

### A.  Specific Relief Requested

Petitioner's habeas petition asks this Court to:

(1) Order respondents to immediately release petitioner from custody pursuant to *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001);

(2) Order that respondents may not seek to remove petitioner to a third country "without notice and a meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings"; and

ORDER GRANTING HABEAS PETITION - 4

(3) Order that respondents may not remove petitioner to any third country

"because Respondents' third country removal program seeks to impose

unconstitutional punishment on its subjects, including imprisonment and other

forms of harm."

Dkt. # 7.

**B. Petitioner's Ability to Seek Relief**

The Government states that it objects to "Baltodano's general arguments about the

government's third country removal process" and, in support of this objection, the Government

seeks to incorporate arguments about third-country removal that the Government previously

made in opposition to the TRO and preliminary injunction. Dkt. # 23 at 12 n.3 (citing Dkts.

# 12, 16). The Government does not specify which prior arguments it seeks to incorporate. *Id.*

After narrowing the universe of the Government's prior arguments concerning third-country

removal to those arguments that (1) are not re-stated in the Government's response to this

habeas petition and (2) are relevant to weighing the merits of this habeas petition, this Court is

left with one prior Government argument: "[T]he Court may not issue the relief sought by

Boltadano because he is a member of the plaintiff class in *D.V.D. v. Dep't Homeland Sec.*, 778

F.Supp.3d 355 (D. Mass. Apr. 18, 2025)." Dkt. # 16 at 3:23–4:5 and 14:1–16:22.

> The plaintiff class in *D.V.D.* sought and received an injunction barring ICE from
> removing members of the class to third countries. That injunction was stayed by two
> orders of the Supreme Court. Baltodano cannot end-run the Supreme Court's stay
> of an injunction barring his removal to a third country by seeking the same relief in
> a different court . . .

1
2

> Simply put, Baltodano is not entitled to another bite at the apple before this Court
> to obtain relief that has already been stayed by the Supreme Court.

3 *Id*. at 4:1–5, 14:9–10. In August, the Government made the same argument in *Nguyen v.*

4 *Scott*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *20–23 (W.D. Wash. Aug. 21,

5
6 2025). More recently, the Government made the same argument to this Court in *Abubaka*

7 *v. Bondi*, No. 2:25-CV-01889-RSL, 2025 WL 3204369, at *2 (W.D. Wash. Nov. 17,

8
9 2025). In the present matter, the Government's previous briefing on this topic is almost

10 word-for-word identical to the Government's briefing on this topic in the *Nguyen* and

11 *Abubaka* cases. *Compare* No. 2:25-CV-01398-TMC, Dkt. # 37 at 17–20 *with* No. 2:25-

12
13 CV-01889-RSL, Dkt. # 11 at 9–11 *and* Dkt. # 16 at 3:23–4:5 and 14:1–16:22. As in

14 *Abubaka* and this Court's preliminary injunction order in this matter (*see* Dkt. # 22 at 6–

15 7), this Court adopts the *Nguyen* court's detailed and thoughtful analysis of this issue and

16
17 the *Nguyen* court's findings that (1) "The class certification order in *D.V.D.* does not

18 prevent this Court from adjudicating Petitioner's claims regarding third-country removal"

19 and (2) absent "clear guidance from the Supreme Court," which the emergency docket

20
21 order in *D.V.D.* does not provide, this Court must follow well-established precedent.

22 *Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *20–23 (W.D. Wash. Aug. 21,

23 2025).

24
25 ### C. Petitioner's Request for Immediate Release Under *Zadvydas*

26 As the *Nguyen* court recounted:

27 > In *Zadvydas*, the Supreme Court held that the [Immigration and Nationality Act]
28 > does not authorize "indefinite, perhaps permanent, detention" of noncitizens subject

1
2
3
4
5
6

> to final orders of removal. 533 U.S. 678, 699, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Applying the doctrine of constitutional avoidance, the Court explained that such an interpretation was necessary "to avoid a serious constitutional threat[.]" *Id.* As the Court recognized, "[a] statute permitting indefinite detention of [a noncitizen] would raise a serious constitutional problem [under] ... [t]he Fifth Amendment's Due Process Clause[.]" *Id.* at 690, 121 S.Ct. 2491. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.*

7    No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *12 (W.D. Wash. Aug. 21, 2025).

8
9    The *Zadvydas* decision traces, in part, to this Court's 1999 decision to order a noncitizen

10   released from custody on due process grounds. *See Kim Ho Ma v. I.N.S.*, 56 F. Supp. 2d 1165

11   (W.D. Wash. 1999) (involving a Cambodian refugee who was convicted of first-degree

12
13   manslaughter, served two years of incarceration, and then was detained by the Immigration and

14   Naturalization Service for over two years while awaiting removal); *Ma v. Reno*, 208 F.3d 815,

15   819 (9th Cir. 2000); *Zadvydas*, 533 U.S. 678, 685 (2001). *See also* C99-151RSL, Dkt. # 79. In

16
17   *Zadvydas*, the Supreme Court held that "for the sake of uniform administration in the federal

18   courts," following a final removal order it is "presumptively reasonable" for the Government to

19   detain a noncitizen for six months while the Government works to remove that person from the

20
21   United States. *Zadvydas*, 533 U.S. 678 at 682, 701 (2001). "After this 6–month period, once the

22   alien provides good reason to believe that there is no significant likelihood of removal in the

23   reasonably foreseeable future, the Government must respond with evidence sufficient to rebut

24
25   that showing." *Id*. at 701. This does not mean a noncitizen may not be held past the six-month

26   period of presumptive reasonability. *Id*. "To the contrary, an alien may be held in confinement

27   until it has been determined that there is no significant likelihood of removal in the reasonably

28

ORDER GRANTING HABEAS PETITION - 7

foreseeable future." But, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

### 1. Petitioner Has Met His Burden Under *Zadvydas*

Once the six-month period of "presumptively reasonable" detention has expired a petitioner seeking release from pre-removal detention must show there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. 678 at 701 (2001). Here, petitioner and respondents now agree that petitioner's detention began, for purposes of the *Zadvydas* analysis, when petitioner was detained by ICE on January 8, 2024. *See* Dkts. # 17, Ex. B at 2 (noting date and time of petitioner's apprehension); # 23 at 9:14; # 26 at 1. That means petitioner has now been detained after a final order of removal for nearly 24 months.[3] Thus, the six-month period of "presumptively reasonable" detention under *Zadvydas* has expired. 533 U.S. 678 at 701 (2001). Petitioner must next show there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

Here, petitioner is a native and citizen of Nicaragua who has been granted deferral of removal to Nicaragua under the CAT. Dkt. # 7, Ex. 1 at 1, 12. In October 2025, the Government

---

[3] Without citing any authority, respondents contend that the clock on the six-month period of "presumptively reasonable" detention under *Zadvydas* should only begin to run *after* the expiration of the 90 days of pre-removal detention permitted under 8 U.S.C. § 1231(a). Dkt. # 23 at 9:14–16. That is not this Court's reading of *Zadvydas*, 533 U.S. 678 at 701 (2001). Thus, this Court has calculated the length of petitioner's detention using January 8, 2024—the date petitioner was detained by ICE—as a starting point. However, the Court notes that even under respondents' method of calculating the length of petitioner's detention, the six-month period of "presumptively reasonable" detention under *Zadvydas* expired more than a year ago. Dkt. # 23 at 9:14–16.

informed petitioner of its intent to remove him to Mexico or Honduras. Dkt. # 21, Ex. A.

Petitioner contends there is no significant likelihood of his removal in the reasonably

foreseeable future because on this record (1) "Removal to Nicaragua is legally deferred by the

immigration court and there is no indication the Ortega dictatorship is likely to end"; (2)

"Petitioner has no ties to any other country and punitive deportation to a third country, which

may be requested by Respondent to imprison him indefinitely and which may not be able to treat

his severe mental illness, would violate the Constitution"; (3) travel documents have not been

secured for any third country; and (4) "Mexico will affirmatively refuse to accept Petitioner"

because he is "not willing to go there." Dkts. # 9 at 5:11–12; # 15 at 16:7–15; # 26 at 2:3, 4:15–

18 (citing Dkt. # 26, Ex. 1 at ¶ 11 (Declaration of Martin Parsons, filed by the Federal

Respondents in *Rios v. Noem*, Case No. CV25-02866-JES-VET (S.D. Cal. Nov. 5, 2025))).

       The Court does not view the Declaration of Martin Parsons (*see* Dkt. # 26, Ex. 1 at ¶ 11),

which was submitted in a separate immigration case, as conclusively determining that Mexico

will now refuse to accept petitioner in this case. However, the Court does find that petitioner has

demonstrated both (1) the impossibility of his removal to Nicaragua given his CAT deferral and

(2) the lack of evidence that respondents are actually removing petitioner to any third country

after nearly 24 months of detention. *See Kamyab v. Bondi*, No. C25-389RSL, 2025 WL 2917522

(W.D. Wash. Oct. 14, 2025). Therefore, petitioner has met his burden to show "good reason to

believe that there is no significant likelihood of removal in the reasonably foreseeable future."

*Zadvydas*, 533 U.S. 678 at 701 (2001) (stating: "[A]s the period of prior postremoval

ORDER GRANTING HABEAS PETITION - 9

confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink.").

### 2. Respondents Have Not Met Their Burden Under *Zadvydas*

Once petitioner has met his burden to show "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the burden shifts to respondents to "respond with evidence sufficient to rebut that showing." *Id*. Here, respondents concede that petitioner's detention is "prolonged" and offer no concrete details regarding the Government's intent to remove petitioner to a third country, stating only that "the third country removal process is ongoing." Dkt. # 23 at 1:23–24, 2:5, 7–11.

> Courts in this circuit have regularly refused to find Respondents' burden met where Respondents have offered little more than generalizations regarding the likelihood that removal will occur. *See, e.g.*, *Singh v. Gonzales*, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006); *Chun Yat Ma*, 2012 WL 1432229, at *4–5; *Hoac*, 2025 WL 1993771, at *3.
>
> For example, in *Singh v. Gonzales*, the court found that ICE had not met its burden where it "merely assert[ed] that it has followed up on its request for travel documents" but could not provide any "substantive indication regarding how or when it expect[ed] to obtain the necessary travel document from the Indian government." 448 F. Supp. 2d at 1220 . . .
>
> More recently, in *Hoac v. Becerra*, . . . 2025 WL 1993771, at *3 . . . [t]he court noted that the "fact that Respondents intend to complete a travel document request for Petitioner does not make it significantly likely he will be removed in the foreseeable future."

*Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *16–18 (W.D. Wash. Aug. 21, 2025). In this matter, respondents have offered no evidence that travel documents for petitioner have even been requested from any third country. Dkt. # 13, 23. Thus,

ORDER GRANTING HABEAS PETITION - 10

respondents have failed to rebut petitioner's showing of "good reason to believe that

there is no significant likelihood of removal in the reasonably foreseeable future."

*Zadvydas*, 533 U.S. 678 at 701 (2001). *See also Kamyab*, No. C25-389RSL, 2025 WL

2917522 (W.D. Wash. Oct. 14, 2025).

The Court does not take lightly respondents' warning that petitioner is still "a danger to

the community." Dkt. # 23 at 11:2. However, the Court is bound by the holding in *Zadvydas*, a

case that notably involved Kestutis Zadvydas, a detained individual with "a long criminal

record" and "a history of flight," and Kim Ho Ma, another detained individual who had been

"involved in a gang-related shooting" and "convicted of manslaughter." 533 U.S. 678 at 684–86

(2001). In *Zadvydas*, the Government's concerns about the histories of the individuals involved

did not prevent the Court from holding that "the Constitution's demands" concerning due

process require granting a detained non-citizen's habeas petition where "removal is not

reasonably foreseeable." *Id.* at 689, 699–700. "[O]f course, the [non-citizen's] release may and

should be conditioned on any of the various forms of supervised release that are appropriate in

the circumstances, and the [non-citizen] may no doubt be returned to custody upon a violation of

those conditions." *Id* at 700. Therefore, this Court orders respondents to immediately release

petitioner from detention on conditions of supervision that are reasonable in light of

respondents' concern that petitioner is "a danger to the community" (Dkt. # 23 at 11:2). In doing

so, this Court notes the "detailed release plan including release to Mr. Baltodano's sister, a

United States citizen who lives in Downey, CA, [that] was proposed during Mr. Baltodano's

ORDER GRANTING HABEAS PETITION - 11

immigration proceedings . . . and could be followed closely today." Dkt. # 15 at 16:2–5. *See also* Dkt. # 15, Ex. 3 at 7 and Ex. 4A–G.

### D. Petitioner's Claims Regarding Due Process and the Current Third-Country Removal Policy

In 2019, this Court held that a "noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden*, 409 F. Supp. 3d 998 at 1009–11 (W.D. Wash. 2019). Citing the due process clause along with relevant statutes and regulations, this Court also held that in the context of a third-country removal, "[g]iving petitioner an opportunity to file a motion to reopen [his removal proceedings] . . . is not an adequate substitute for the process that is due process in these circumstances." *Id*. Rather, a petitioner facing third-country removal must be able to pursue his claim for withholding of deportation in *reopened* removal proceedings before an immigration judge. *Id*. In August, the *Nguyen* court noted that this Court's holdings in *Aden* "flow directly from binding Ninth Circuit precedent" and held that ICE's current policy on third-country removals "contravenes Ninth Circuit law." *Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *18–19 (W.D. Wash. Aug. 21, 2025).

Courts in this district have recently found that due process challenges to ICE's third-country removal policy are likely to succeed on the merits. *See Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288 at *19 (W.D. Wash. Aug. 21, 2025) (finding petitioner was "likely to succeed on his claim that removal to a third country under ICE's current policy, without

meaningful notice and reopening of his removal proceedings for a hearing, would violate due process"); *Baltodano v. Bondi*, No. C25-1958-RSL, 2025 WL 2987766, at *3 (W.D. Wash. Oct. 23, 2025) (finding petitioner "likely to succeed on the merits of his claim that he is entitled to 'legally required multistep procedures set out in 8 U.S.C. § 1231(b) and required by due process' before ICE can remove him to a third country"); *J.R. v. Bostock*, No. 2:25-CV-01161-JNW, 2025 WL 1810210, at *3 (W.D. Wash. June 30, 2025); *Phetsadakone v. Scott*, No. 2:25-CV-01678-JNW, 2025 WL 2579569, at *4 (W.D. Wash. Sept. 5, 2025); *Phaymany v. Northwest Immigration and Customs Enforcement Processing Center*, 2:25-cv-00854-RAJ-MLP (W.D. Wash. Sept. 25, 2025).

Here, unlike in those instances, the Court will be making a final determination on the merits of petitioner's argument that due process does not allow respondents to remove him to a third country "without notice and a meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings." Dkt. # 7. Respondents here argue that petitioner has been provided notice of the Government's intent to deport him to Honduras or Mexico, and that "[i]f he does fear removal to Honduras or Mexico, Baltodano may file a motion to reopen his immigration case" and "[the Government] will not attempt to remove him if a motion to reopen is pending." Dkt. # 23 at 11:3–16. This Court recognizes that *Aden* is not binding precedent in this or any other judicial district, or even upon this Court in this case. *Evans v. Skolnik*, 997 F.3d 1060, 1067 (9th Cir. 2021) (citing *Camreta v. Greene*, 563 U.S. 792, 709 n.7 (2011)). That being said, this Court finds that its ruling in *Aden* remains persuasive today and therefore this Court adopt its holdings in *Aden* for the purposes of this ruling. As

discussed above, *Aden* held that "[g]iving petitioner an opportunity to file a motion to reopen [his removal proceedings] . . . is not an adequate substitute for the process that is due process in these circumstances." 409 F. Supp. 3d 998 at 1009–11 (W.D. Wash. 2019). Rather, a petitioner must be able to pursue his claim for withholding of deportation in *reopened* removal proceedings before an immigration judge. *Id*. Here, respondents have only stated that "Baltodano may file a motion to reopen his immigration case" if he fears removal to Honduras or Mexico and "[the Government] will not attempt to remove him if a motion to reopen is *pending*." Dkt. # 23 at 11:3–16 (italics added). This is insufficient in that respondents' voluntary promise appears to apply only to petitioner's potential removal to Honduras or Mexico, rather than to *any* third country respondents might eventually consider. *Aden*, 409 F. Supp. 3d 998 at 1009–11 (W.D. Wash. 2019).

In addition, while respondents here have provided petitioner with notice of their intent to remove him to Honduras or Mexico, and have made the aforementioned voluntary promises regarding third-country removal to Honduras and Mexico, they have not committed to providing similar notice with regard to intended or actual removal to *any* third country. Dkt. # 23 at 11:3–16. As a result, the Government's voluntary promises here are even narrower than the narrow voluntary promise made by the Government in *Abubaka*, No. 2:25-CV-01889-RSL, 2025 WL 3204369, at *6–7 (W.D. Wash. Nov. 17, 2025), where this Court found that the Government's voluntary promise to provide 24-hours advance notice before *any* third-country removal was insufficient to protect the petitioner's statutory and due process rights. Therefore, this Court permanently enjoins respondents from removing this petitioner to any third country "without

ORDER GRANTING HABEAS PETITION - 14

notice and a meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings." Dkt. # 7. *Aden*, 409 F. Supp. 3d 998 at 1009–11 (W.D. Wash. 2019).

### E. Petitioner's Claims Regarding the "Punitive" Nature of the Current Third-Country Deportation Policy

Petitioner claims the Government's current third-country deportation policy is "punitive" and therefore unconstitutional under *Wong Wing v. United States*, 163 U.S. 228, 236–38 (1896). Dkt. # 7 at 12:12–13:7, 15:14–17:2.

> In *Wong Wing*, the Court invalidated a portion of the [Chinese Exclusion Act] which provided that "any such Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States, *shall be imprisoned at hard labor for a period not exceeding one year*, and thereafter removed from the United States." *Wong Wing*, 163 U.S. at 233–34, 16 S.Ct. 977 (emphasis added). The Court held that while "it is within the constitutional power of congress" to deport those unlawfully present in the United States, Congress could not add to the sanction of expulsion the "punishment by imprisonment at hard labor ... without a trial by jury." *Id.* at 235, 16 S.Ct. 977. The Court explained that there is a fundamental difference between "detention or temporary confinement" while awaiting deportation and "imprisonment at hard labor." *Id.* at 236, 16 S.Ct. 977. The latter, the Court concluded, was an "infamous punishment" that could only be imposed following a criminal trial with the full protection of the Fifth and Sixth Amendments. *Id.* at 237–38, 16 S.Ct. 977.

> More than a hundred years later, the Court affirmed this holding in *Zadvydas*, noting that it had previously "held that the Due Process Clause protects an [noncitizen] subject to a final order of deportation, ... though the nature of that protection may vary depending upon status and circumstance[.]" 533 U.S. at 693–94, 121 S.Ct. 2491 (citation modified). *Zadvydas* further clarified *Wong Wing* had "held that punitive measures could not be imposed upon [noncitizens] ordered removed because 'all persons within the territory of the United States are entitled to the protection' of the Constitution." *Id.* at 694, 121 S.Ct. 2491 (quoting *Wong Wing*, 163 U.S. at 238, 16 S.Ct. 977). The Court described this as a "substantive protection[ ] for aliens who had been ordered removed." *Id.* at 694, 121 S.Ct. 2491. In the wake

ORDER GRANTING HABEAS PETITION - 15

1
2
3
4

of these cases, the Ninth Circuit has similarly "recognized [ ] limits on detention of noncitizens pending removal," specifically noting that "[s]uch detention may not be punitive[.]"*Rodriguez v. Robbins*, 804 F.3d 1060, 1076 (9th Cir. 2015), *rev'd sub nom. on other grounds Jennings v. Rodriguez*, 583 U.S. 281, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (citation omitted).

5
6
7
8
9
10
11
12
13

*Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *23 (W.D. Wash. Aug. 21, 2025). In *Nguyen*, as here, the court was presented with a claim that the Government's current third-country deportation policy is "punitive" and therefore unconstitutional under *Wong Wing*. *Id*. In analyzing that claim, the *Nguyen* court first took judicial notice of "statements made by government officials, both on social media and to the press, acknowledging that deportees to third countries are being imprisoned and expressing intent to continue that practice." *Id*. The *Nguyen* court found that:

14
15
16
17
18
19
20
21

> [T]hese statements . . . do offer evidence that third country deportation is occurring as a punishment. *See, e.g.*, Dkt. 25 at 13 (official video of President Donald J. Trump stating "[I]f illegal aliens choose to remain in America, they're remaining illegally and they will face severe consequences. Illegal aliens who stay in America face punishments, including significant jail time, enormous financial penalties, confiscation of all property, garnishment of all wages, imprisonment and incarceration, and sudden deportation in a place and manner solely of our discretion."); *see also id.* (statement by President Donald J. Trump that immigrants would be detained at Guantanamo Bay prison because "it's a tough place to get out" and "we don't want them coming back.").

22
23
24
25
26
27
28

*Id*. at *24. Because *Nguyen* involved a pre-1995 Vietnamese immigrant, the *Nguyen* court also analyzed "sworn declarations that pre-1995 Vietnamese immigrants who have been deported to South Sudan and Eswatini have been imprisoned incommunicado since their arrival." *Id* at *8, 24. Finally, the *Nguyen* court noted that "[o]ther courts across the country have recognized that the government is intentionally removing individuals to

countries where they will be imprisoned," including El Salvador. *Id*. at *24. Granting a

preliminary injunction in favor of petitioner, the *Nguyen* court found, among other things,

that the petitioner in that case was likely to succeed on the merits of his claim that the

Government's "practice of third-country removal paired with imprisonment violates due

process" under *Wong Wing* and *Zadvydas*. *Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL

2419288, at *23–25 (W.D. Wash. Aug. 21, 2025). The *Nguyen* matter was voluntarily

dismissed by its petitioner the following month after an "agreement between the parties,"

and thus never reached a merits decision. *See* No. 2:25-CV-01398-TMC at Dkts. # 52,

53.

    In *Abubaka*, this Court applied the *Nguyen* court's findings concerning the

"punitive nature" of the current third-country removal policy as part of this Court's ruling

on the merits of a habeas petition from a different pre-1995 Vietnamese immigrant. No.

2:25-CV-01889-RSL, 2025 WL 3204369, at *8 (W.D. Wash. Nov. 17, 2025). This Court

then held in *Abubaka* that the Government's "practice of third-country removal paired

with imprisonment is intended to be punitive and thus violates due process under *Wong

Wing*, 163 U.S. 228 at 236–38 (1896), and *Zadvydas*, 533 U.S. 678 at 693–4 (2001)." *Id*.

This Court ordered the respondents in *Abubaka* "not to remove petitioner to any third

country where he is likely to face imprisonment upon arrival." *Id*.

    Unlike *Nguyen* and *Abubaka*, the present matter does not involve a pre-1995

Vietnamese immigrant. *Id*. Petitioner here is a native and citizen of Nicaragua who was

deported from this country in Feb. 2019 after a determination that he had committed a

ORDER GRANTING HABEAS PETITION - 17

particularly serious crime. Dkt. # 13 at ¶ 4–5. Petitioner then re-entered this country

"without inspection or parole . . . on or about January 7, 2024." *Id*. However, another

court in this district has recently held the current third-country removal program to be

"unconstitutionally punitive" in a case involving a habeas petitioner who was born in

France to Iranian refugees, came to the United States on a tourist visa in April 2000,

overstayed his tourist visa, "had a series of California state convictions . . . most recently

receiving a 3-year prison sentencing in 2024," was released early in May 2025, and was

detained by ICE "the same day." *Hambarsonpour v. Bondi*, No. C25-1802-RSM, 2025

WL 3251155, at * 1, 4–5 (W.D. Wash. Nov. 21, 2025). Citing this Court's holding in

*Abubaka*, the *Hambarsonpour* court found "that the government's practice of third-

country removal paired with imprisonment [or harm] is intended to be punitive and thus

violates due process under *Wong Wing*, 163 U.S. 228 at 246-38 (1896), and *Zadvydas*,

533 U.S. 678 at 693-4 (2001)." *Id*. at * 4–5 (quoting *Abubaka*, No. 2:25-CV-01889-RSL,

2025 WL 3204369, at *8 (W.D. Wash. Nov. 17, 2025)). The *Hambarsonpour* court thus

enjoined the Government from removing the French-born petitioner in that matter to a

country other than the one designated (France) "pursuant to Respondents'

unconstitutionally punitive third-country removal program," and further ordered that

"Respondents may not remove Petitioner to a third country where he is likely to face

imprisonment or harm." *Id.* at * 5. Notably, the *Hambarsonpour* court added to this

Court's holding in *Abubaka* by prohibiting removal to a third country where the

ORDER GRANTING HABEAS PETITION - 18

*Hambarsonpour* petitioner is likely to face either "imprisonment *or harm*." *Id.* (italics

denoting the *Hambarsonpour* court's addition).

In response to this petitioner's arguments about the "punitive" nature of the

current third-country removal policy, respondents here argue (1) that petitioner "cannot

show . . . that anyone has acted punitively towards him in deciding to pursue third

country removal" and (2) that "[t]here is no evidence the government's decision to pursue

third country removal is punitive toward Baltodano." Dkt. # 23 at 11:5–7, 11:18–19,

12:1–2. "Rather," respondents here argue, "the government is seeking third country

removal to protect the public . . . ." *Id*. at 11:19–24.

Petitioner counters that "if Respondents manage to coerce a third country into

accepting someone they have continually characterized as 'dangerous,' it is likely

Petitioner will be imprisoned or forwarded to Nicaragua, where he is likely to be

tortured." Dkt. # 26 at 6:18–20. In support of the argument that petitioner will "likely" be

imprisoned in any third country that would accept him, petitioner cites news articles

supporting petitioner's contention that "[t]hird countries including El Salvador, Costa

Rica, Panama, and South Sudan have been paid by the United States government to

imprison individuals who are deemed dangerous." Dkt. # 26 at 6:20–7:12. Petitioner also

argues that despite an order from a United States Immigration Judge granting him

deferral of removal to Nicaragua under the CAT, he will "likely" be sent onward from a

third country to Nicaragua "where he is likely to be tortured." Dkt. # 26 at 6:18–20. In

support of this argument, petitioner cites Justice Sonia Sotomayor's dissent in *D.H.S. v.*

ORDER GRANTING HABEAS PETITION - 19

*D.V.D.*, 145 S. Ct. 2153 (2025). In that dissent, Justice Sotomayor recounted the fate of

"a Guatemalan man known in this litigation as O.C.G.," writing:

> O. C. G. explained that he had previously been forced to flee Guatemala after facing torture and persecution there for his identity as a gay man. See Dkt. 8–4, p. 1; ECF Doc. 1, p. 24. He fled initially to Mexico, he said, but had not found safety there, either: A group of men raped him and locked him in a room until his sister paid them a ransom. ECF Doc. 8–4, at 1. O. C. G. accordingly asked the [immigration] judge whether he "could be deported to a country other than Mexico or Guatemala." *Ibid*. The Immigration Judge granted withholding of removal to Guatemala, the only country designated in the order of removal. *Id.*, at 1–2; see also ECF Doc. 1, p. 25. Because the government had not sought to remove O. C. G. to Mexico, the Immigration Judge did not address his request for protection against removal there. ECF Doc. 8–4, at 1–2; ECF Doc., at 25.
>
> Two days later, Immigration and Customs Enforcement escorted O. C. G. out of his cell and put him on a bus to Mexico. ECF Doc No. 8–4, at 2. On the way, they provided him with "oral notice that he would be removed to Mexico." See ECF Doc. 106–1, p. 3 (Defendants' Response to Requests for Admission). DHS did not issue a new order of removal designating Mexico, did not reopen the prior proceedings, and did not provide either O. C. G. or his lawyer with advance notice. *Id.*, at 3–4. Mexican authorities promptly deported O. C. G. back to Guatemala, where he went into hiding. ECF Doc. 1, at 5.

*D.V.D.*, 145 S. Ct. 2153 at 2154–55 (2025).

This Court also notes the case of *D.A. v. Noem*, No. 25-CV-3135 (TSC), 2025 WL 2646888 (D.D.C. Sept. 15, 2025), in which U.S. District Court Judge Tanya S. Chutkan considered the fate of five non-citizen plaintiffs who had been granted either withholding of removal under the Immigration and Nationality Act or, like petitioner here, deferral or removal under the CAT due to their likelihood of persecution, torture, or death if they were returned to their home countries. The plaintiffs in that case alleged that while being held at an ICE facility, they were awakened "in the middle of the night," shackled, and

put on a U.S. military cargo plane to Ghana, a country to which none had any connection. *Id*. at * 1. Once in Ghana, "They were taken to Dema Camp, a remote, open-air detention facility surrounded by armed military guards." *Id*. In *D.A.*, Judge Chutkan found that the Government "transported Plaintiffs to Ghana with no notice or opportunity to challenge that removal, under what appears to be a hasty and unwritten agreement with Ghana, which has indicated its intention to return Plaintiffs to their home countries where [the Government] agree[s] they will almost certainly be persecuted." *Id.* at * 3. The case, Judge Chutkan wrote, is "not an outlier." *Id.* at * 2. Rather, she found that the Government's actions in *D.A.* "appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly." *Id*. Judge Chutkan also decried "the government's cavalier acceptance of Plaintiffs' ultimate transfer to countries where they face torture and persecution," although Judge Chutkan ultimately could not grant the *D.A.* plaintiffs' request for a TRO due to the court's hands being "tied" by lack of jurisdiction. *Id.* at * 3, 8. This account of the Government's recent actions under the current third-country removal policy is deeply concerning. So is the account provided by Justice Sotomayor's dissent in *D.V.D.*, 145 S. Ct. 2153 at 2154–55 (2025), although the Court recognizes that Justice Sotomayor's account predates the current third-country removal policy by less than a month. *See Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *19 (W.D. Wash. Aug. 21, 2025).

Given these accounts, the Court finds that although petitioner is not a pre-1995 Vietnamese immigrant like the petitioner in *Abubaka*, petitioner here, like the petitioner in *Abubaka*, has shown a reasonable fear of third-country removal paired with imprisonment. No. 2:25-CV-01889-RSL, 2025 WL 3204369, at *8 (W.D. Wash. Nov. 17, 2025). *See also Hambarsonpour*, No. C25-1802-RSM, 2025 WL 3251155, at * 1, 4–5 (W.D. Wash. Nov. 21, 2025). Therefore, as in *Abubaka*, this Court holds that the Government's practice of third-country removal paired with imprisonment is intended to be punitive and thus violates due process under *Wong Wing*, 163 U.S. 228 at 236–38 (1896), and *Zadvydas*, 533 U.S. 678 at 693–94 (2001).This Court, adopting the *Hambarsonpour* court's formulation, orders respondents here not to remove petitioner to any third country where he is likely to face imprisonment or harm. No. C25-1802-RSM, 2025 WL 3251155, at * 4–5 (W.D. Wash. Nov. 21, 2025)

However, on this record the Court does not find sufficiently clear evidence indicating that the Government intends to punish non-citizens by using "bridge countries" to make "an end run around" CAT deferral. Dkt. # 26 at 7:16–26. To make it perfectly clear, petitioner's concern appears to be that the Government is deporting non-citizens to third countries that will then send those non-citizens onward to their home countries, even where a U.S. Immigration Court has issued an order preventing the non-citizen from being removed directly from the U.S. to his or her home country due to the likelihood the person will face persecution, torture, or death in that country. *Id. See also D.A. v. Noem*, No. 25-CV-3135 (TSC), 2025 WL 2646888, at * 1–3, 8 (D.D.C. Sept. 15, 2025) (Judge

Chutkan decrying "the government's cavalier acceptance of Plaintiffs' ultimate transfer to countries where they face torture and persecution."). The Court shares this concern, but on this record the Court does not find sufficiently clear evidence of punitive intent.

The Court is ordering that respondents may not remove petitioner to any third country without notice and a meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings. In any reopened removal proceedings that may occur, petitioner could raise his arguments about the possibility of being sent onward from a third country to Nicaragua.

### III.    Conclusion

For all the foregoing reasons, petitioner's petition for writ of habeas corpus (Dkt. # 7) is GRANTED.

The Court ORDERS respondents to immediately release petitioner from detention on conditions of supervision that are reasonable in light of respondents' assertion that petitioner poses "a danger to the community." Dkt. # 23 at 11:2. In doing so, the Court notes the "detailed release plan including release to Mr. Baltodano's sister, a United States citizen who lives in Downey, CA, [that] was proposed during Mr. Baltodano's immigration proceedings . . . and could be followed closely today." Dkt. # 15 at 16:2–5. *See also* Dkt. # 15, Ex. 3 at 7 and Ex. 4A–G.

The Court additionally ORDERS that respondents are permanently enjoined from removing petitioner to a third country without notice and meaningful opportunity to

respond in compliance with the statute and due process in reopened removal proceedings. *See Aden*, 409 F. Supp. 3d 998 at 1009–11 (W.D. Wash. 2019).

Finally, the Court holds that the government's practice of third-country removal paired with imprisonment is intended to be punitive and thus violates due process under *Wong Wing*, 163 U.S. 228 at 236–38 (1896), and *Zadvydas*, 533 U.S. 678 at 693–94 (2001). *See Abubaka*, No. 2:25-CV-01889-RSL, 2025 WL 3204369, at *8 (W.D. Wash. Nov. 17, 2025); *Nguyen*, No. 2:25-CV-01398-TMC, 2025 WL 2419288, at *23–24 (W.D. Wash. Aug. 21, 2025); *Hambarsonpour*, No. C25-1802-RSM, 2025 WL 3251155, at * 1, 4–5 (W.D. Wash. Nov. 21, 2025). Therefore, the Court ORDERS respondents not to remove petitioner to any third country where he is likely to face imprisonment or harm.

IT IS SO ORDERED.

DATED this 4th day of December, 2025.

Robert S. Lasnik
United States District Judge